```
 1  TRACY L. WILKISON
    United States Attorney
 2  SCOTT M. GARRINGER
    Assistant United States Attorney
 3  Chief, Criminal Division
    NISHA CHANDRAN (Cal. Bar No. 325345)
 4  Assistant United States Attorney
    General Crimes Section
 5       1200 United States Courthouse
         312 North Spring Street
 6       Los Angeles, California 90012
         Telephone: (213) 894-2429
 7       Facsimile: (213) 894-0241
         E-mail:    nisha.chandran@usdoj.gov
 8
 9  Attorneys for Plaintiff
    UNITED STATES OF AMERICA
10
```

11                    UNITED STATES DISTRICT COURT

12                 FOR THE CENTRAL DISTRICT OF CALIFORNIA

| | |
|---|---|
| 13  UNITED STATES OF AMERICA, | No. 22-MJ-02075 |
| 14            Plaintiff, | MOTION IN SUPPORT OF GOVERNMENT'S REQUEST FOR DETENTION AND |
| 15            v. | OPPOSITION TO DEFENDANT'S MOTION TO BE RELEASED ON BOND PENDING |
| 16  SERHAT GUMRUKCU, | TRIAL |
| 17            Defendant. | Hearing Date: June 15, 2022<br>Hearing Time: 1:00 p.m. |

22       Plaintiff United States of America, by and through its counsel

23  of record, the United States Attorney's Office for the Central

24  District of California and Assistant United States Attorney Nisha

25  Chandran, hereby files its motion in support of its request for

26  detention and opposition to defendant SERHAT GUMRUKCU's motion to be

27  released on bond pending trial.

This motion and opposition are based upon the attached memorandum of points and authorities, the files and records in this case, and such further evidence and argument as the Court may permit.

Dated: June 13, 2022                  Respectfully submitted,

                                        TRACY L. WILKISON
                                      United States Attorney

                                        SCOTT M. GARRINGER
                                        Assistant United States Attorney
                                        Chief, Criminal Division

                                            /s/
                                        NISHA CHANDRAN
                                        Assistant United States Attorney

                                        Attorneys for Plaintiff
                                        UNITED STATES OF AMERICA

**MEMORANDUM OF POINTS AND AUTHORITIES**

**I.    INTRODUCTION**

Defendant Serhat Gumrukcu poses a significant risk of flight and a danger to potential witnesses, and there are no conditions of release which will reasonably assure his appearance or witness safety. In a case with compelling evidence including co-conspirator testimony, a defendant with significant foreign ties and substantial resources, who is alleged to have committed the instant offense while on pretrial release and who previously fled to avoid trial on a much less serious charge, would likely flee or improperly influence witnesses rather than spend his life in prison or face the death penalty. Accordingly, the Court should order Gumrukcu's detention pending transfer to the charging district.

**II.   BACKGROUND**

On May 19, 2022, a federal grand jury sitting in Burlington, Vermont returned a sealed indictment charging Gumrukcu with murder-for-hire conspiracy with death resulting, in violation of 18 U.S.C. § 1958. The Indictment alleges that Gumrukcu conspired with Berk Eratay and others between May 2017 and February 2018 to cause interstate travel and to use interstate facilities in aid of a plot to pay someone to kill Gregory Davis. In separate, related indictments, the grand jury charged Jerry Banks with kidnapping Davis and charged Aron Ethridge with conspiring to kidnap Davis. The charging documents outline a conspiracy among these four men to have Banks travel to Vermont to murder Davis for money; this goal was successful.  The other three co-conspirators have been arrested and are detained pending trial.

Gumrukcu was arrested on May 24, 2022, at Los Angeles International Airport. He appeared for his Rule 5 removal to Vermont on May 26, 2022. The government moved for detention. The Court continued the detention hearing until June 2, 2022, and again until June 15, 2022. Gumrukcu has filed a motion for release proposing a substantial bond in an attempt to assure the Court of his appearance and to protect potential witnesses.

**III. FACTUAL PROFFER**

The government's evidence establishes the following relationships among the four charged defendants. Gregory Davis was killed in January 2018 after he was kidnapped from his Vermont home by a person falsely claiming to be a United States Marshal. In the early part of the investigation, law enforcement identified Serhat Gumrukcu as a likely suspect involved in the murder because Gumrukcu and his brother, Murat Gumrukcu, were the only people who appeared to have a serious dispute with Davis or any motive for Davis's execution.

In 2017, Davis was threatening the Gumrukcus about going to the FBI with evidence that the Gumrukcus were defrauding him in a multimillion-dollar oil deal the Gumrukcus had entered into with Davis in early 2015. The Gumrukcus failed to perform on the deal and made various claims about their attempts to perform. Davis believed that the Gumrukcus lied to him about various matters. During that same period, Serhat Gumrukcu was facing felony fraud charges in California state court. One aspect of those fraud charges involved bounced checks Serhat Gumrukcu had provided to the middleman in the oil deal, Gregory Gac. On the bounced checks, Serhat Gumrukcu falsely

called himself "HRH Prince Serhat Gumrukcu," a reference to His Royal Highness.

Also in 2017, Serhat Gumrukcu was in the midst of putting together a different deal through which he obtained a significant ownership stake in a biotech company, Enochian Bioscience. During 2017, fraud complaints by Davis would have at least complicated the Enochian transaction, and likely would have scuttled the Enochian deal altogether. Gumrukcu therefore had a strong motive to prevent Davis from reporting yet another fraud.  At present, Serhat Gumrukcu appears to own over $100 million worth of Enochian stock. In May 2022, about a week before his arrest, he generated $2 million in cash from an Enochian stock sale.

Neither Serhat nor Murat had traveled to Vermont to personally kill Davis, so the likely plot involved a hired hit man. Murat Gumrukcu, a Turkish resident, visited the United States between December 2017 and March 2018. He stayed at Eratay's former apartment in Las Vegas at the time of the murder. Federal agents executed a search warrant at Eratay's apartment before Murat left the United States. Both Gumrukcus were interviewed in early 2018 about Davis, denying any involvement in the murder. Murat Gumrukcu falsely denied contact with Gac, the middleman in the oil deal, describing the oil deal as his brother's responsibility. Serhat Gumrukcu falsely minimized his involvement in the oil deal. Murat Gumrukcu has not returned to the United States since March 2018.

After these interviews, the government investigation entered a long covert stage during which law enforcement sought to identify the hit man. That investigation began to bear fruit in 2020, when Jerry

3

Banks was identified as a suspect. As described in the attached complaint affidavit, the government's covert investigation built a strong case against Banks. Banks, however, had no relationship with either Gumrukcu or Davis. Thus, the government looked for evidence identifying the middleman or middlemen between Banks and Gumrukcu, and an obvious chain emerged. Banks was close friends with Aron Ethridge; Ethridge was a friend of Eratay; Eratay worked for Gumrukcu.

Multiple pieces of evidence emerged to support the conspiracy. Banks met with Ethridge on various occasions in late 2017 as the murder scheme was being finalized. Ethridge was the first person Banks telephoned after the murder. Ethridge did not appear to have direct contact with Gumukcu, but he had contacts with Eratay. Indeed, the first call Ethridge made after receiving the post-murder call from Banks was to Eratay's phone. Ethridge had no direct connection with Davis; Eratay was the obvious link between Ethridge and Gumrukcu.

The government also developed substantial corroboration about Serhat Gumrukcu's financial support for the conspiracy. Eratay's bank records reveal over $150,000 in wire transfers from Turkish accounts controlled by Gumrukcu between June and October of 2017, as the murder scheme was building. Eratay transformed those funds into cash almost immediately after receiving them. Eratay withdrew the cash in increments of $9,000, slightly below the $10,000 currency reporting requirement. Further, Eratay's Google data (obtained by search warrant) shows that he documented personal information about Davis in July 2017, including his full name, date of birth, place of birth,

4

1  and cell phone with a Vermont area code.
2      Between 2018 and 2022, the government investigation remained
3  covert. The coconspirators, from Banks to Gumrukcu, likely thought
4  that they had gotten away with murder. In April 2022, the government
5  took its first overt steps. On April 6, 2022, Banks was arrested in
6  Wyoming. During a custodial interview, Banks made a number of false
7  exculpatory statements, including the false claim that he had never
8  been to Vermont. The next day, Ethridge was approached by law
9  enforcement. Although he denied knowledge of any scheme in his
10 initial consensual interview, Ethridge soon reached out to law
11 enforcement to come clean about his role.
12     In a non-custodial and voluntary interview, and prior to being
13 made aware of any of the government's evidence in this case, Ethridge
14 admitted that he was hired by Eratay and Gumrukcu to find someone to
15 murder Davis and that he enlisted Banks to kill Davis. Ethridge
16 admitted receiving over $100,000 cash and additional Bitcoin as
17 payment for the murder, and sharing these proceeds with Banks.
18 Ethridge's admissions are highly credible – Ethridge has no reason to
19 falsely implicate himself in a murder, which will result in his
20 spending many years in jail, and Ethridge's confession included
21 details that Ethridge could not have known unless he was involved.
22 Ethridge has been indicted and remains detained. The government
23 anticipates that he will be a witness at any trial against Eratay,
24 Gumrukcu, and Banks.

5

**IV. ARGUMENT**

    **A. Applicable Law**

Under the Bail Reform Act, 18 U.S.C. §§ 3141 et seq., federal courts are empowered to order a defendant's detention pending trial upon a determination that the defendant is either a danger to the community or a risk of flight. 18 U.S.C. § 3142(e). A finding of risk of flight must be supported by a preponderance of the evidence. See, e.g., United States v. Patriarca, 948 F.2d 789, 793 (1st Cir. 1991); United States v. Jackson, 823 F.2d 4, 5 (2d Cir. 1987); United States v. Chimurenga, 760 F.2d 400, 405 (2d Cir. 1985). A finding of dangerousness must be supported by clear and convincing evidence. See, e.g., United States v. Ferranti, 66 F.3d 540, 542 (2d Cir. 1995); Patriarca, 948 F.2d at 792; Chimurenga, 760 F.2d at 405.

The Bail Reform Act lists four factors to be considered in the detention analysis: (1) the nature and circumstances of the crimes charged; (2) the weight of the evidence against the person; (3) the history and characteristics of the defendant, including the person's "character . . . [and] financial resources"; and (4) the seriousness of the danger posed by the defendant's release. See 18 U.S.C. § 3142(g). Evidentiary rules do not apply at detention hearings, and the Government is entitled to present evidence by way of proffer, among other means. See 18 U.S.C. § 3142(f)(2); see also United States v. LaFontaine, 210 F.3d 125, 130-31 (2d Cir. 2000) (Government entitled to proceed by proffer in detention hearings). Where a judicial officer concludes after a hearing that "no condition or combination of conditions will reasonably assure the appearance of

the person as required and the safety of any other person and the community, such judicial officer shall order the detention of the person before trial." 18 U.S.C. § 3142(e)(1).

**B.    Eligibility for Detention**

Gumrukcu is eligible for detention because the case involves a crime of violence for which a maximum term of imprisonment of ten years or more is prescribed, see 18 U.S.C. § 3142(f)(1)(A); an offense for which the maximum sentence is life imprisonment or death, see 18 U.S.C. § 3142(f)(1)(B); a serious risk that the defendant will flee, see 18 U.S.C. § 3142(f)(2)(A); and a serious risk that the defendant will obstruct or attempt to obstruct justice, or threaten, injure, or intimidate, or attempt to threaten, injure, or intimidate, a prospective witness or juror, see 18 U.S.C. § 3142(f)(2)(B).

**C.    Gumrukcu Poses a Risk of Flight**

Gumrukcu poses a substantial risk of flight. Indeed, all three statutory factors relating to risk of flight support detention here.

   1.    Seriousness of the Offense Charged

The defendant is charged with a crime universally recognized as the most serious offense, premeditated murder. The instant offense carries a penalty of, at a minimum, mandatory life imprisonment. The offense is also death-penalty eligible. The Attorney General has not yet decided whether to seek the death penalty.

The possibility of a substantial sentence is a significant factor in assessing the risk of flight. See United States v. Moscaritolo, No. 10 Cr. 4 (JL), 2010 WL 309679, at *2 (D.N.H. Jan. 26, 2010) ("[T]he steeper the potential sentence, the more probable

7

the flight risk is, especially considering the strong case of the government.") (quoting United States v. Alindato-Perez, 627 F. Supp. 2d 58, 66 (D.P.R. 2009)).  The very real prospect of Gumrukcu spending the rest of his life in prison provides him with a compelling incentive to flee.

### 2. Strength of the Government's Case

The government has already assembled strong evidence during this ongoing investigation. The government has attached the affidavit in support of the complaint authorizing Banks' arrest, the person hired by Gumrukcu to kill Gregory Davis, Ex. 1, and an April 2022 affidavit in support of a search warrant authorizing a broader search of two of Eratay's email accounts (this affidavit also incorporates two 2020 search warrant affidavits for Eratay's email account), Ex. 2. Those documents, outlining only part of the government's case to date, paint a compelling picture.

As noted above, the defendant and his brother appear to be the only people with a motive to kill Gregory Davis. The government has assembled an overwhelming case that Jerry Banks acted as the hit man for the murder. Banks' only connection to Davis is through Ethridge and Eratay to Gumrukcu. Ethridge has admitted that he acted as the middleman between Banks and Eratay, who stated that he was acting on behalf of Gumrukcu. The financial records show that Gumrukcu paid over $150,000 from his Turkish bank account to Eratay during the conspiracy, which Eratay withdrew in cash. Ethridge admitted that he was paid over $100,000 in cash from Eratay. Eratay lied to law enforcement about his knowledge of Davis, as shown by the contents of Eratay's own Google account. In an interview with law enforcement,

8

Gumrukcu falsely minimized his dispute with Davis. During 2017, Gumrukcu was facing multiple due diligence reviews to succeed at closing the Enochian deal, and was facing a criminal prosecution in California courts. He was very motivated to keep Davis from going to the FBI.

### 3. History and Characteristics of the Defendant

Gumrukcu's history and characteristics also strongly support detention. Multiple aspects of Gumrukcu's history provide evidence that no conditions should satisfy the Court that Gumrukcu would appear for trial.

While Gumrukcu has some ties to the United States, he also has substantial ties outside the United States. He is not a United States citizen. And his brother, Murat Gumrukcu, who was also involved in the charged conduct, as well as his immediate family members, all live outside of the United States in Turkey. His only current ties to the United States are his spouse, his house, and his current business ventures involving medical treatment and research. None of those provide a significant anchor for someone facing mandatory life in prison. His spouse could easily live outside the country with the defendant and would presumably rather live with him outside the country than have the defendant spend his life in jail. The defendant's business ventures can fail or succeed without his presence in the United States. Indeed, Enochian's CEO has published a letter to shareholders outlining the company's independence from the defendant. Ex. 3. The defendant's house is an asset he could liquidate or even lose. A house matters little during a life spent in prison. Gumrukcu has access to significant funds to obtain false

9

documents, to remove/mask electronic monitoring devices, to conduct concealed travel, and to generally abscond and fugitate. Common sense suggests that Gumrukcu would hide or flee rather than spend the rest of his life in jail or face the death penalty. Put simply, a wealthy citizen of a foreign country charged with murder should be detained pending trial.

Gumrucku has a documented history of fraud. California state court records show that Gumrukcu engaged in fraud prior to the Enochian deal. He was arrested in early 2017 and charged with multiple felonies involving two different fraud schemes. One involved evidence that in 2014 Gumrukcu defrauded a Turkish investor of almost $1 million in a real estate investment. Gumrukcu told the investor that he was spending the funds on purchasing and renovating a Los Angeles home, when in fact Gumrukcu was spending the money on other matters. Gumrukcu also provided the investor with bogus documents, supposedly prepared by an attorney. The other alleged fraud scheme in the state case involved bounced checks directly connected to Gumrukcu's dealings with Gac and Davis. Ex. 4 (State's filed summary of evidence). In a post arrest interview, Gumrukcu essentially admitted the housing investment fraud. Gumrukcu was held over for trial on those charges after a probable cause hearing in early October 2017. In early January, just after Davis' murder, Gumrukcu pleaded guilty to one felony charge immediately after making restitution to the Turkish investor and Gac. Under California law, Gumrukcu later successfully modified the felony conviction charge into a misdemeanor.

Gumrukcu has a history of fleeing pending charges. Gumrukcu was

10

arrested in Turkey in 2012 for fraud and fled the country while that criminal case was pending. He has remained outside Turkey since then, avoiding that prosecution. In 2020, he unsuccessfully sought to dismiss the Turkish case from outside the country. In spite of this failure, he chose not to return to face the charges. His flight to avoid a fraud prosecution from his home country and attendant failure to appear provides strong evidence that he would flee to avoid life in prison.

Gumrukcu has a history of violating his conditions of release. In early 2017, Gumrukcu was released on substantial bail by the California court. Gumrukcu committed the charged murder for hire while on pretrial release on the California case. If Gumrukcu would kill a potential witness during pretrial release on a state fraud case, he would be willing to flee or obstruct witnesses in this murder case.

Gumrukcu appears to have provided false information to this Court about his background. In his motion for release, Gumrukcu represented to the Court that he received an MD and the equivalent of a PhD at First Moscow State Medical University. Defense Memo. at 23. This claim is supported on the Enochian website by Russian documents stating that Gumrukcu's obtained his MD degree in 2006 after having studied in Russia beginning in 2000. Ex. 5. These recent claims, however, are undercut by Gumrukcu's statements about his medical background in 2017 while putting the Enochian deal together. During 2017, people working with Gumrukcu asked him to describe his medical background. In an email on June 29, 2017, he described his medical training without any mention of an MD and the equivalent of a PhD

from First Moscow State. Instead, he wrote:

> Serhat Gumrukcu (MD PhD) has over 10 years of research and practice experience in the field of Personalized and Regenerative Medicine, focusing on innovative treatments using stem cell technologies, biological treatments, cancer immunology and nanoparticle delivery systems. Dr. Gumrukcu's pioneering work has led to multiple breakthrough achievements in the field of stem cell tech technologies focusing on HIV, chronic degenerative diseases, organ/system failures, and cancer immunotherapy. He has recently finished developing a sterilizing HIV cure AGTHERA, which incorporates the principles of bone marrow transplantation and gene therapy. Along with AGTHERA, his nanoparticle based protective HIV vaccine HIVMUNE is also in development by Enochian Biosciences. Dr. Gumrukcu has studied medicine in Dokuz Eylul University in Turkey and continued to receive post graduate degrees in comparative religion and clinical psychology along with his research studies and practice in Europe and Asia. He is fluent in 7 languages.

Ex. 6. The Russian MD records, Ex. 5, also conflict with archived Enochian accounts by Gumrukcu about his training, which state that he studied medicine in Turkey without receiving a degree and then went to Russia in 2004. Ex. 7. This other account also claims that Gumrukcu continued his medical residency in Turkey (not Russia) and that he received his PhD from RUDN University, not First Moscow State. Published on-line sources provide additional details suggesting that Gumrukcu fraudulently obtained his Russian credentials. Ex. 8.

Gumrukcu's "medical practices" also demonstrate that he believes himself above the law. The documents submitted by the defense to the Court confirm government information that Gumrukcu has long been involved in "treating" terminally ill patients, including a Pennsylvania civil judgement obtained against Grumrukcu for treating a patient in 2015. Ex. 8 at 20. At the same time, he has acknowledged

12

that he has never obtained a license to practice medicine in the United States. Publicly available evidence suggests that he never obtained a license to practice medicine in Turkey. A defendant willing to flout medical practice regulations for years would surely ignore a Court's conditions of release.

Gumrukcu notes that he has known about the investigation for years but has not fled. Although Gumrukcu was interviewed in 2018, the investigation has been covert for years before several weeks ago. Gumrukcu remained in the dark about the government's intentions and evidence until he was arrested last week, and therefore had little motive to flee. Before his indictment and arrest, he likely thought that he had gotten away with Davis' murder.

Finally, Gumrukcu offers a variety of character letters to support his release motion. These character letters provide scant comfort for the Court. Some of the letters point out Gumrukcu's "healing" powers. The defendant's ability to heal, whether true or not, is irrelevant to his risk of flight. Several letters comment on the potential scientific benefits from Gumrukcu's supposed medical inventions. Many of these letters come from individuals with financial connections to Enochian, and these references therefore have a financial stake in Gumrukcu's "successes" since Davis's murder. In any event, Gumrukcu's medical genius, like his "healing" powers, do not diminish the risk of flight. Further, many of the letters provide insufficient information about the depth of writer's knowledge about Gumrukcu. Only a few letters are from people who knew Gumrukcu before 2017 when he got the Enochian deal off the ground. To the extent that the Court decides to credit these unsworn and

13

uncrossed character letters, it should also then consider the well-sourced, recently published information about Gumrukcu's business past, serial lies, and the potential fraud at Enochian. Ex. 8 and 9.

### 4. Gumrukcu Poses a Danger to the Community

Gumrukcu's alleged conduct reflects a substantial danger to potential witnesses in this case. The evidence shows that Gumrukcu hired Banks to kill Davis in order to keep Davis from going to the FBI, with Gumrukcu making a significant cash payment to secure the murder. There is no reason to believe he would not also hire people to kill or otherwise gain advantage in a criminal case such as this one, which carries a penalty of life in prison.

### D. **Gumrukcu's Proposed Release Conditions**

Gumrukcu has proffered significant bail in an effort to counter the risk of his flight and the risk to witnesses. Gumrukcu's proposed collateral should not assure the Court of his appearance. The Enochian deal has generated huge financial rewards for Gumrukcu. To the extent that Gumrukcu has access to tens of millions of dollars in Enochian stock, he can stand to lose a few million dollars. No amount of money, even substantial funds, is worth keeping if one is going to spend the rest of his life in jail. Gumrukcu, who earned his millions only in the past few years, would presumably be able to start over again in a foreign country.

Gumrukcu includes as proposed collateral the equity in the home of a friend. The Court does not have sufficient information to assess this proposal. The friend's relationship with Gumrukcu is unclear. The equity in the home comes only from the friend. Perhaps the friend

14

is willing to lose the house because Gumrukcu will make up the loss. In any event, whatever belief this friend has in Gumrukcu should not override the strong reasons for detention.

The Court should find that the proposed condition does not "reasonably assure the appearance of the person as required and the safety of any other person." 18 U.S.C. § 3142(e). The proposed collateral focuses solely on flight. High bail would provide no assurance that Gumrukcu would not participate in a plan to influence witnesses, a plan that might require no travel at all.

**V.  CONCLUSION**

For the reasons set forth above, the government urges the Court to detain Gumrukcu pending his transfer to the District of Vermont.