VICTOR SHERMAN (SBN 38483)
LAW OFFICES OF VICTOR SHERMAN
11400 West Olympic Boulevard, Suite 1500
Los Angeles, California 90064
Telephone (424) 371-5930
Facsimile (310) 392-9029
Email: victor@victorsherman.law

Attorney for Defendant
SERHAT DANIEL GUMRUKCU

UNITED STATES DISTRICT COURT

FOR THE CENTRAL DISTRICT OF CALIFORNIA

| | |
|---|---|
| UNITED STATES OF AMERICA,<br><br>　　　　Plaintiff,<br><br>　　v.<br><br>SERHAT DANIEL GUMRUKCU,<br><br>　　　　Defendant. | CA Case No. 22-MJ-02075<br>VT Case No. 22-CR-581<br><br>**Amended Motion to Be Released on Bond Pending Trial; Memorandum of Points and Authorities in Support Thereof; Exhibits A-I** |

　　　　Defendant Serhat Daniel Gumrukcu opposes a detention order that would have him held without bail. As will be shown, he is an asset, not a danger to the community, and there is no reason to believe he will flee. His life, assets and career are all located in the Central District of California. With assets of over $3.5 million

///

///

///

1

to contribute to his bond, Dr. Gumrukcu urges that the court set and release him on bail.

Dated: June 13, 2022                    Respectfully submitted,

/s/ Victor Sherman
VICTOR SHERMAN
Attorney for Defendant
SERHAT DANIEL GUMRUKCU

# MEMORANDUM OF POINTS AND AUTHORITIES

**A** *Defendant's Background and Character*

Dr. Serhat Daniel Gumrukcu immigrated to the United States around 2013. Not long after arriving here, Dr. Gumrukcu married William Anderson Wittekind in 2013. He became a permanent resident in 2014.

Dr. Gumrukcu came here as a Turkish national, having received his medical training at Dokuz Eylul University in 2004 in Izmir, Turkey. He went on to receive further medical trainings abroad.

For the first couple of years he was in the United States, Dr. Gumrukcu traveled frequently to African and European countries to consult with other physicians about their mutual patients, as well as for humanitarian purposes. He stopped traveling internationally in 2015 to focus on his research, one offshoot of which was Enochian Bio, which was formed in 2016. The company followed on the heels of the type of research that Dr. Gumrukcu was conducting into HIV, cancer, and infectious diseases.

Prior to his involvement with Enochian, Dr. Gumrukcu was already attracting the attention of his peers, many of whom saw his work across disciplines to be cutting edge, and a potential cure for cancer. They describe someone who is admired and beloved by his associates. Until joining Enochian, Dr. Gumrukcu had not previously considered how much more effective he could be with a group of scientists committed to the same goals.

3

Dr. Gumrukcu also consults at Seraph Medical PC, a practice owned by Dr. Phillip Musikanth MD, where he and Dr. Musikanth collaborate to improve the lives of patients with serious and life-threatening diseases. While medical staff at Seraph Medical see and treat patients, Dr. Gumrukcu's role is solely to serve as a consultant to the patients' treatment team. Dr. Gumrukcu has no patients of his own and defers all patient-care decisions to the treating physician.

Dr. Gumrukcu has been deeply involved with HIV research for many years, and applied for his first patent in the United States in 2017 for a procedure to reconstitute bone marrow. This was followed by another patent in 2018 for using dendritic cells for cancer therapy. Over the ensuing years, Dr. Gumrukcu applied for three more patents for such things as an allogeneic T-cell-based HIV vaccine, treatments for cancer and infectious diseases, and a possible cure for hepatitis-B. Exhibit B.[1]

Over the years, Dr. Gumrukcu has made generous charitable donations totaling over $600,000. These contributions have included giving over $110,000 to the Elton John AIDS Foundation. He also gave over $30,000 to Project Angel Food, as well as giving $9,500 to the Alliance for Housing and Healing. Other contributions have included $5,000 to the Los Angeles LGBT Center, $30,000 to

---

[1] Exhibit B is a timeline documenting his activities and achievements over the last several years.

4

Kiss the Ground a non-profit dedicated to reversing climate change, $10,000 to the AIDS Foundation, $5000 to the Network for Good and $350,000 to fund Dr. Gumrukcu's non-profit research institute. Exhibit B.

Dr. Gumrukcu's non-profit is the Seraph Research Institute ("SRI"). SRI is located at 4142 Lankershim Blvd. in Toluca Lake. Much of its work is focused on developing cures for cancer, HIV, HBV, COVID, and influenza. Exhibit B.

In 2020, he was busy publishing and attending conferences in the United States regarding his research, which had broadened to include COVID and SARS, as well as hepatitis-B and influenza. Dr. Gumrukcu continued publishing and attending conferences in 2021. It was at the beginning of 2021 that Dr. Gumrukcu and his husband, William Anderson Wittekind, purchased their current home on Curson Avenue in Los Angeles, California. Towards the end of 2021, Dr. Gumrukcu and his husband acquired the 60,000 square-foot property on Lankershim where they are realizing Dr. Gumrukcu's dream of having a life sciences campus with a mission to find cures and put an end to people's suffering from HIV, Covid, Cancer and rare diseases.

In March of this year, Enochian Biosciences entered into a partnership with Caring Cross to use Dr. Gumrukcu's patented bone marrow reconstruction platform to improve the effectiveness of a potential cure for HIV with an anti-HIV CAR-T

therapy that Caring Cross is studying in a clinical trial. They are hoping to soon begin experiments to use this technology to treat HIV and other illnesses.

Many letters that have been received attest to Dr. Gumrukcu's character and the generosity, compassion, and humanitarian benevolence he has consistently demonstrated. Alexia Zumbrum is Dr. Gumrukcu's husband's sister and Dr. Gumrukcu's sister-in-law. She remarks:

> Serhat surrounds himself with good natured, intelligent, peaceful., and benevolent individuals. Serhat and those he takes up company with have a mission to make positive change in their community and on a greater global scale. Serhat has worked extensively to make a difference in humanity through his efforts to find treatments and cures for illness, diseases, life threatening conditions and more. Many of his travels over the years have been organized around bringing treatment to patients all over the world. When we visit and catch up be is always most excited to share about his healing work.

Exhibit A.

Those on Dr. Gumrukcu's security team are with him throughout the day. They state that they have never seen Dr. Gumrukcu lose his temper or composure. Juan Barba has been the head of Dr. Gumrukcu's security team for approximately three years. He states:

6

> I have always known Dr. Gumruckcu to be a kindhearted individual who gives selflessly of himself to help others in need. I have never seen him lose his temper or act aggressively toward anyone even when I believed he was dealing with situations that were not pleasant. Dr. Gumruckcu has always treated me and all the members of the security team with respect and kindness, even though we were there to ensure his needs were taken care of, he would always make sure our needs were taken care of as well.

Exhibit A.

Brady Pesola also served on Dr. Gumrukcu's security detail form late 2018 until late 2020.  He writes:

> During that time I witnessed nothing but love, compassion and kindness for everyone around him. He was loved by everyone around him and always looked after the people he served, and those that served him are loyal because of his kindness and upstanding character.

Exhibit A.

Michael Schlesinger is an attorney who was diagnosed a year ago with such severe heart damage from COVID-19 that he became a candidate for a heart transplant.  When Dr. Gumrukcu found out about his condition, he immediately

> replied that Seraph Medical was working on a stem cell therapy that he believed could reverse the heart damage.
>
> As predicted, I was treated by Serhat's group and miraculously my heart muscle recovered to pre-Covid condition, and the specter and fear of a heart transplant was removed from my prognosis. During the treatment time, Serhat would reach out to me to see how I was doing.

Exhibit A.

Mehrdad Davoudpour came to Dr. Gumrukcu after having exacerbated a prior spinal injury. He reports:

> At my initial appointment, Dr. Musikanth and Dr. Gumrukcu patiently spent hours providing details to my every question regarding the regenerative stem cell treatment protocol they would be providing. In addition, while many doctors profit heavily off their patients, Dr. Musikanth and Dr. Gumrukcu only charged for the cost of the treatment. Their clinic is brimming with people who are suffering from debilitating pain to terminal illnesses; whom other doctors have deemed as hopeless cases. Individuals, whose lives, and mine, their collaborative work has transformed and saved. Furthermore, I personally know of multiple individuals, who were unable to afford the

8

cost of their customized treatment, and were provided with the same level of care completely free of charge.

Exhibit A.

Gary "Julian" Goldstein works in HIV healthcare and knew of Dr. Gumukcu as someone who worked closely with highly respected doctors seeing the same patients that Goldstein sees. Mr. Goldstein got to know Dr. Gumrukcu when he began consulting on his mother's case:

> My mother who was a professor at UCLA., became ill with cancer in 2016. She has been working with some of the top oncologists at UCLA. There have been times when those doctors were stumped and did not know how to help my mother. Serhat looked at her lab results and made suggestions which were outside of the normal protocol of the oncologists at UCLA yet at my mother's request they decided to take Serhat suggestions. In one instance my mother was having severe edema and Serhat strongly suggested that my mother get an albumin infusion. The doctors agreed to try this and it instantly worked. The doctors have told me that since this time they have been using this protocol to treat other cancer patients with edema and they had not done this in the past and they expressed their gratitude to Serhat for his suggestion as other patients have been helped by this suggestion.

Exhibit A.

**B**     *Serhat Daniel Gumrukcu Should Be Admitted to Bail and Not Detained Before Trial*

A defendant may only be detained pending trial where "no condition or combination of conditions will reasonably assure the appearance of the person as required and the safety of any other person and the community." 18 U.S.C. § 3142(e)(1). Accordingly, a detention order is only justified when a defendant presents either a risk of nonappearance or a danger to the community. *United States v. Motamedi*, 767 F.2d 1403, 1406 (9th Cir. 1985). A finding that a defendant poses a risk of nonappearance must be supported by a preponderance of the evidence, while a danger finding must be supported by clear and convincing evidence. 18 U.S.C. § 3142(f); *United States v. Gebro*, 948 F.2d 1118, 1121 (9th Cir. 1991) (per curiam). In making those findings, courts must consider: (1) the nature and circumstances of the offense charged; (2) the weight of the evidence against the defendant; (3) the history and characteristics of the defendant; and (4) the nature and seriousness of the danger to any person or to the community that would be posed by the defendant's release. 18 U.S.C. § 3142(g); *United States v. Winsor*, 785 F.2d 755, 757 (9th Cir. 1986).

Obviously, the nature and circumstances of the charged offense are quite serious.  However, neither the defendant nor his counsel have seen a scintilla of evidence to support the charge other than rank conjecture by the case agent.  The

criminal complaint discusses the evidence against Jerry Banks, the alleged killer, but never so much as mentions Dr. Gumrukcu. As the California Supreme Court has observed, "The [liberty] of even the most hardened criminal should not be staked on such a flimsy foundation." *People vs. Terry*, 57 Cal.2d 538, 566-567 (1962).

If it is the government's conviction that Dr. Gumrukcu should remain in custody before trial, it should come forward with witnesses and evidence and allow both to be tested. In the instant case, there is nothing other than an unproven and untested allegation in the indictment and no extrinsic evidence to corroborate anything. As stated in *United States v. Huckins*, 53 F.3d 276, 279 (9th Cir. 1995), the Court should either deem the allegation unreliable or demand that the government subject its claims to scrutiny. The failure to do either means that Dr. Gumrukcu could be kept in jail without bail on the basis of a mere accusation that have never been substantiated. As previously noted, the agents' suspicions of the defendant's involvement, without any supporting documentation or witness statements only confirms the flimsy nature of the case against this particular defendant.

Without further evidence to substantiate the claims that the government has made, the detention determination in this case flies in the face of the constitutional presumption that bail will be granted, U.S. Const. amend. VIII; *Stack v. Boyle*, 342 U.S. 1, 4 (1951), and the burden that § 3142 places on the government to show that no combination of conditions will assure the defendant's appearance. *United States*

*v. Townsend*, 897 F.2d 989, 994 (9th Cir. 1990).  Because "[d]oubts regarding the propriety of release are to be resolved in favor of defendants," *id.*, release should be denied "[o]nly in rare circumstances."  *Motamedi*, 767 F.2d at 1405.  It certainly should not be denied where, as here, no evidence of the defendant's culpability has been produced.

      Despite the assertion in the Pretrial Services Report that "[i]t has only been in the last month that the alleged killer and other co-defendants have been identified and arrested," PSR at 5, this is shown to be false by the Criminal Complaint.  While it is true that Banks was arrested a month ago, the affidavit in support of the Criminal Complaint makes it clear that authorities had learned a great deal about Banks very quickly years ago after tracing the cell phone and car that he was using.

      While Dr. Gumrukcu was aware that the FBI was interested in him many years ago and then earlier this year, he did not hire counsel until recently.  When he did, his attorney, Roy Black, contacted the FBI and requested all future contact should be through counsel.  The agent complied, stating that he had forwarded the "email to the primary case agent responsible for the matter so that it is properly communicated to the investigative team."  Exhibit I.  Dr. Gumrukcu had no plans to flee, and has never attempted to do so, even though the FBI has contacted him several times over the last four years.

When one moves on to consider the history and characteristics of Dr. Gumrukcu, he has a much broader and richer tale to tell. As the history of his accomplishments and the letters written on his behalf attest, the qualities for which Dr. Gumrukcu is best known – kindness, compassion, generosity, and selflessness – are entirely incongruent with the charge.

As will be addressed, Dr. Gumrukcu does not pose a risk to anyone or to the community. He also does not represent a flight risk. While the four factors identified in *Winsor* are meant to guide the court's analysis, the two questions that the court must answer are whether defendant poses either a risk of nonappearance or a danger to the community. If not, he should not be detained before he has been convicted of a crime.

In terms of making this judgment, Dr. Gumrukcu is prepared to controvert the allegations in the Pretrial Services Report that are contended to require Dr. Gumrukcu's detention.

**1.     Serhat Daniel Gumrukcu Does Not Represent a Flight Risk**

Dr. Gumrukcu has known about this case for years and was first interviewed by the FBI nearly four years ago. In this time, he has had the opportunity to flee, but has not. Instead, he has only increased his ties to the community, having only recently bought his current home, and begun construction on the $18,450,000 project that Dr. Gumrukcu envisions as a life sciences campus and home to his non-profit,

the Seraph Research Institute. Exhibit C. It is expected that when completed the entire project will cost between more than 75 million dollars and potentially as much as $150 million dollars.

Dr. Gumrukcu also has verified resources. He currently has a $4 million dollar mortgage on a home estimated to be worth $6.7 million. Exhibit D. Since his initial appearance, he has been able to increase the size of the bail he can offer. His husband's father has come forward and is pledging $1 million as part of an unsecured bond.

Dr. Gumrukcu's ties to the community could not be more solid. He is married to a U.S. citizen and owns a home in Los Angeles. In fact, his husband reports that the work that Dr. Gumrukcu has done in the Los Angeles area is the source of their substantial income last year which has largely been re-invested into forwarding the mission of Seraph Research Institute through donations, the purchase of property and funding of Seraph Medical PC. It is also in Los Angeles that Dr. Gumrukcu has pursued his plan to create a non-profit research institute that facilitates scientists with similar goals. He is currently signing lease agreements and Letters of Intent with tenants in the field of gene therapy and research.

With both financial and family ties to the community, Dr. Gumrukcu is solidly part of the community in which he lives. This is corroborated by how much the people who know Dr. Gumrukcu believe in him. In every way, Dr. Gumrukcu is the

14

opposite of a flight risk. He has strong ties to the United States and to the Central District of California. He lives here, works here, owns substantial property here and is married here. *Cf.* Townsend, 897 F.2d at 996. He has spent the last year further investing in the Los Angeles area, both with his purchase of a home and purchase of property for the Seraph Research Institute and his life sciences campus.

Notwithstanding the factors in Dr. Gumrukcu's favor, the Pretrial Services Report identifies several issues that it asserts preclude Dr. Gumrukcu from being released on bail. Taken seriatim, none actually represents a risk that Dr. Gumrukcu will not remain in the community and appear for trial.

### a) Allegation: Dr. Gumrukcu Was Arrested When Boarding a Flight to New York

The suggestion that Dr. Gumrukcu's trip to New York had anything to do with an intent to flee is shown to be false by the substantial evidence that Dr. Gumrukcu had planned a brief trip. The purpose of the trip was to attend the J.P. Morgan Founder's forum from May 25-26. In this regard, Dr. Gumrukcu had not only booked a ticket to New York, he also purchased a return flight to Los Angeles. His husband had also booked a hotel room over a week earlier for the period from May 24 to May 27, 2022. Exhibit F.

Dr. Gumrukcu booked the return flight for May 27 because his father was having surgery on May 26 and Dr. Gumrukcu wanted to be with him while he

recovered. Prior to leaving, Dr. Gumrukcu's parents were staying with him because of the surgery. Dr. Gumrukcu's parents live in Turkey and had not seen him for two years. It was anticipated that Dr. Gumrukcu's father would recuperate for some time in Dr. Gumrukcu's home upon his release from the hospital.

### b) Allegation: Dr. Gumrukcu Has Ties to and a Passport from a Foreign Country

Dr. Gumrukcu has not traveled abroad in so many years that he allowed his Turkish passport to expire in 2020. Exhibit G. He currently has no way to leave the country. With all that he has established here, Dr. Gumrukcu would be giving up everything in his life were he to flee and abandon everything he has built.

Dr. Gumrukcu's passport is currently in the custody of Dr. Gumrukcu's attorney who stands ready to provide it to the court to assure Dr. Gumrukcu will make his appearances and not flee.

In fact, Dr. Gumrukcu has been pursuing United States citizenship since September 23, 2020 when an N-400 application for naturalization. Exhibit H. He has been a lawfully admitted permanent resident since March 2014. Exhibit G. His immigration attorney states that they are awaiting an appointment with the U.S. Citizenship and Immigration Service. Exhibit H.

///

///

16

        **c)**       **Allegation: Dr. Gumrukcu Recently Liquidated $2 Million**

While Dr. Gumrukcu did sell approximately $2 million in Enochian stock, he also recently purchased his home and the $18.5 million property where he is planning his life sciences campus, both of which are in Los Angeles. Notwithstanding the liquidation of these funds, the case agent reports that Dr. Gumrukcu still retains stock worth almost $100 million, which is restricted because he is an insider. PSR at 6. Trading or selling restricted stock is very difficult and time consuming. In fact, the stock certificates that Dr. Gumrukcu recently sold are still with transfer agents and have yet to be delivered to the purchaser.

The purpose of withdrawing those funds was to liquidate two percent of Dr. Gumrukcu's Enochian stock to repay a debt of $1 million and to pay for renovations on the buildings that Dr. Gumrukcu had recently acquired for Seraph Research Institute and his life sciences campus. If anything, Dr. Gumrukcu was only investing more heavily in this country and the Los Angeles area. The sale was certainly not intended to fund an attempt to flee the country.

        **d)**       **Allegation: Dr. Gumrukcu Is Not Licensed to Practice Medicine in this Country**

Dr. Gumrukcu has never purported to be licensed or practicing medicine in the United States. The defendant serves as a consultant to treating physicians at Seraph Medical, a practice wholly owned by Phillip Musikanth. A Patient Services

17

Agreement signed by all patients of Dr. Musikanth states Dr. Gumrukcu is a consultant advising the practice. It explains that Dr. Gumrukcu was foreign trained and is not licensed in the United States. While his insights as a consultant are valued, the Agreement makes it clear states that Dr. Gumrukcu he is not a decision-maker in the patient's care. When Dr. Gumrukcu has contributed to a patient's care, he has always done so in the service of a properly licensed medical doctor. It is up to the attending physician to approve or reject his recommendations.

        e)      **Allegation: Dr. Gumrukcu Owns Assets in a Foreign Country**

According to the Pretrial Services Report, "The case agent has evidence suggesting the defendant has at least 4 foreign bank accounts in Turkey." It is true that Dr. Gumrukcu has Turkish bank accounts. These accounts, however, were opened many years ago and before Dr. Gumrukcu came to the United States. Other than the funds that Dr. Gumrukcu liquidated, as explained above, there have been no significant recent changes in his financial activities.

    **2.**      **Serhat Daniel Gumrukcu Is in No Way a Danger to Anyone in the Community**

It is far harder to find that Dr. Gumrukcu represents a danger to the community. He has been aware of the FBI's investigation for four years and has

18

only increased his stake hold in the Central District of California. In that time he has earned the praise and admiration expressed in the many letters written on his behalf.

As even the Pretrial Service Report acknowledges, Dr. Gumrukcu has a minimal criminal history, consisting of a single conviction from an act occurring eight years ago that resulted in a misdemeanor conviction that was later dismissed. Dr. Gumrukcu received a sentence of five-years probation.

Other than this old conviction and the current charge itself, there is nothing to substantiate a finding that Dr. Gumrukcu presents a danger, particularly in light of the lack of evidence supporting the charge.

## CONCLUSION

Dr. Gumrukcu has established strong ties to the Los Angeles area. At the same time, he has not traveled abroad in seven years and has allowed his only passport to expire. Other than the charge itself, and a minor conviction from years ago, there is no basis to find that Dr. Gumrukcu represents a danger to anyone. Accordingly, the Court should find that Dr. Gumrukcu can show that he is neither a danger or flight risk and order him released on bond as proposed. Counsel is suggesting bail in the amount of $3.5 million to be secured by real property and an affidavit of surety for $1 million to be signed by his father-in-law. Finally, the defendant is willing to accept home detention with appropriate monitoring either in

Los Angeles or Vermont pending the conclusion of the case. Defendant will also agree as to any other conditions the court deems proper as part of any bail conditions.

Dated: June 13, 2022                              Respectfully submitted,

/s/ Victor Sherman
VICTOR SHERMAN
Attorney for Defendant
SERHAT DANIEL GUMRUKCU